UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JESSE LEE ENGLAND,

|  |  |
|---|---|
| *Plaintiff*, | CASE NO. 15-12818 |
|  | DISTRICT DAVID M. LAWSON |
| *v.* | MAGISTRATE JUDGE PATRICIA T. MORRIS |

COMMISSIONER OF SOCIAL SECURITY,

_____ *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 17, 20)

### I. RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that England is not disabled. Accordingly, **IT IS RECOMMENDED** that England's Motion for Summary Judgment (Doc. 17) be **DENIED**, that the Commissioner's Motion for Summary Judgment (Doc. 20) be **GRANTED**, and that this case be **AFFIRMED**.

### II. REPORT

#### A. Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for child disability benefits under 20 C.F.R. 404.350(a)(5), and the Supplemental Security Income Program ("SSI") of program of Title XVI Social

Security Act ("the Act"), 42 U.S.C. § 1381 *et seq*. (Doc. 4; Tr. 1-4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 17, 20).

Plaintiff Jesse England was twenty-three years old as of February 28, 2014, the date of the ALJ's decision. (Tr. 17, 150). Her applications for benefits were initially denied on June 26, 2012. (Tr. 94-95). England requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ David Mason on January 14, 2014. (Tr. 35-69). England, represented by attorney James Cmejrek, testified, as did vocational expert ("VE") Luann Castellana. (*Id*.). On February 28, 2014, the ALJ issued a written decision in which he found England not disabled. (Tr. 17-34). On June 12, 2015, the Appeals Council denied review.[1] (Tr. 1-4). England filed for judicial review of that final decision on August 10, 2015. (Doc. 1). The parties have submitted their motions for summary judgment. (Docs. 17, 20). On April 8, 2016, England submitted a reply brief that largely duplicates the arguments in her motion for summary judgment. (Doc. 21).

**B.    Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the

---

[1] England included in her submission to the Appeals Council several new exhibits which were not part of the record before the ALJ, namely exhibits 8F, 9F, and 10F. (Tr. 5, 677-767). These documents are of no assistance in determining whether the ALJ's decision was supported by substantial evidence, and the Court is not permitted to consider them. See Foster v. Halter, 279 F.3d 348, 357 (6th Cir. 2001) ("[T]his court has repeatedly held that evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review.").

correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

C.      **Framework for Disability Determinations**

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

3

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial
> gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment
> or combination of impairments that "significantly limits . . .
> physical or mental ability to do basic work activities," benefits
> are denied without further analysis.

> Step Three:  If the claimant is not performing substantial
> gainful activity, has a severe impairment that is expected to
> last for at least twelve months, and the severe impairment
> meets or equals one of the impairments listed in the
> regulations, the claimant is conclusively presumed to be
> disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past
> relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her
> past relevant work, if other work exists in the national
> economy that plaintiff can perform, in view of his or her age,
> education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528,

534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the

existence and severity of limitations caused by [his or] her impairments and the fact that

she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of*

*Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if

the analysis reaches the fifth step without a finding that the claimant is not disabled.

4

*Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found England not disabled under the Act. (Tr. 36). The ALJ found at Step One that England had not engaged in substantial gainful activity following the alleged onset date, July 28, 2010, and that she had not yet attained age 22 as of the alleged onset date. (Tr. 22). At Step Two, the ALJ concluded that England had the following severe impairments: "lupus, fibromyalgia, s/p right shoulder surgery, seizures, posttraumatic stress disorder, and history of opioid abuse." (*Id.*). At Step Three, the ALJ found that England's combination of impairments

5

did not meet or equal one of the listed impairments. (Tr. 23). The ALJ then found that England had the residual functional capacity ("RFC") to perform light work, except she would also be limited to

> Simple, routine, repetitive tasks in a work environment free of fast paced production requirements involving only simple work related decisions with few, if any, work place changes; occasional contact with coworkers, supervisors, and the general public; off task 8% total during the workday for a total of 5 minutes per hour exclusive of break and meal periods; no more than occasional ramps and stairs; no ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; no exposure to dangerous hazards, dangerous moving machinery, or unprotected heights; no concentrated exposure to temperature extremes, humidity, dampness, cold, or heat; no concentrated exposure to fumes such as dusts, odors, gases, and poorly ventilated areas; no overhead reaching with the right upper extremity; no more than frequent use of the hands for grasping and fingering; no more than frequent pushing and pulling with the right dominant hand; and no more than frequent reaching in all directions with the right, upper, dominant extremity.

(Tr. 25-28). At Step Four, the ALJ found that England had no past relevant work. (Tr. 29). At Step Five, the ALJ concluded that England retained the ability to perform work which exists in significant numbers in the national economy. (Tr. 29-30).

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has thoroughly reviewed England's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

2.       **Application Reports and Administrative Hearing**

a.       **England's Function Report**

England completed a function report on August 3, 2012, in which she asserted that she was disabled due to lupus, which resulted in pain, swelling, difficulty climbing stairs or  sitting, or standing for more than twenty minutes. (Tr. 200, 207). She also experienced violent grand mal seizures resulting in disorientation and injuries; extreme chronic fatigue requiring three or four naps daily; sleeping twelve hours nightly; memory loss, cognitive difficulties, chronic nausea, and diarrhea. (Tr. 207).

England's mother took care of her pets on her behalf; she was no longer able to jog, attend events or classes, swim, work, go out in the sun, or "live." (Tr. 201). She found it difficult to fall asleep due to discomfort and pain, but also found herself oversleeping. (*Id*.). She had trouble working buttons on clothing, was losing her hair, and found it difficult to grip a razor, but was otherwise able to perform self-care. (*Id*.). She did not require reminders to perform personal care, but used a pill organizer to remember when to take medication. (Tr. 202). She could prepare simple meals, and did so only a weekly or monthly basis, a substantial decline from her prior habit of cooking nightly. (*Id*.). She found it difficult to stand for extended periods of time, became nauseous frequently, and had little appetite. (*Id*.). She dusted and made her bed on rare occasion, but performed no other chores due to feeling "pain . . . sick[ness] or tired[ness]." (Tr. 202-03). She also noted that she needed to "feel really good that day," or "feel guilty for being unable to help" before she would partake in those chores. (Tr. 203).

England left home at least once daily, and could get around by walking, driving, and riding in cars. (Tr. 203). She was unable to go out alone if she experienced a seizure in the last six months. (*Id.*). Likewise she could drive only if she was seizure free for six months. (*Id.*). She never partook in shopping. (*Id.*). England wrote that she could not pay bills or use a checkbook, but appears to have believed that the question was about whether she could afford her bills rather than whether she was physically and mentally able to manage bills. (*Id.*). England also noted that she was unable to obtain money, and the "stress of management causes worsening of lupus symptoms (flare-ups)." (Tr. 204).

As to hobbies, England wrote that she enjoyed painting and photography, nature walks, traveling, and writing, and used to enjoy jogging and swimming prior to becoming ill. (Tr. 204). She also enjoyed going to movies, sitting at parks, and eating lunch. (*Id.*).

England became depressed during lupus flare-ups and became agitated with others. (Tr. 205). She never attended parties or "big social events," and lost many friends due to her condition; she was unable to walk around the mall or "stay out all night." (*Id.*).

England wrote that she was limited in terms of lifting, bending, standing, walking, sitting, stair climbing, memory, completing tasks, concentration, following instructions, and getting along with others. (Tr. 205). She wrote that she could lift twenty pounds, experienced persistent back pain after bending or standing for more than twenty minutes, and experienced severe leg and ankle pain after walking one-half mile or sitting for thirty minutes. (*Id.*). She was unable to pay attention, and had difficulty following instructions. (*Id.*). She got along well with authority figures. (Tr. 206). England was able to keep her

8

composure when faced with stress in public, but pulled her hair when stressed at home. (*Id.*).

As regards medication, England wrote that she experienced dizziness, constipation, dry mouth, weight gain, and insomnia side effects from her use of Ultram, Suboxone, Cymbalta, and Prednisone. (Tr. 207).

### b.     England's Testimony at the Administrative Hearing

At the January 14, 2014, hearing before the ALJ, England asserted that she would be unable to return to her past work as a waitress because of pain, fatigue, and seizures. (Tr. 39-40). England asserted that she last experienced a seizure about eight months prior to the hearing. (Tr. 42). Because England was at least six months from her last seizure, she was able to drive, and drove about three times weekly. (Tr. 43-44). England asserted that she lost her friends because she was unable to drink alcohol or party, and ceased attending college following a seizure at Washtenaw Community College wherein she urinated on herself, causing great embarrassment. (Tr. 44). England attended church every other week for about forty-five minutes to an hour. (*Id.*). She sometimes had difficulty standing and waiting in line for communion. (*Id.*).

England asserted that she kept in touch with friends and family by phone. (Tr. 45). She enjoyed art, and made charcoal drawings and portraits, though her hand pain sometimes prevented those activities. (*Id.*). She did not make use of a computer, but had a cell phone on which she used Facebook. (Tr. 45-46). She smoked about one-half of a pack of cigarettes daily. (Tr. 46). England did not drink, and stopped using marijuana

9

about four of five months prior. (Tr. 46-47). England also noted that she had issues abusing prescription medication, in particular Percocet, taking more than prescribed. (Tr. 47). England asserted that she was then taking Suboxone for pain, which "helps a lot with the pain," and did not have any impact on her mental state. (Tr. 48). Her blood pressure medication left her feeling somewhat dizzy. (Tr. 49).

England noted that her pain was mostly limited to the joints, and in particular her left hip. (Tr. 49). She received steroid injections, but nevertheless sometimes experienced ten out of ten pain which prevented her from walking. (Tr. 50). On average, the pain was a seven out of ten. (*Id*.). She also reported some shoulder pain following a Bankart tear and Hills-Sachs lesion that occurred while she was experiencing a seizure, and which still caused pain six out of ten pain on occasion. (*Id*.). She also experienced ankle pain at a rate of five out of ten, sometimes stretching upwards to nine out of ten. (Tr. 50-51). She also reported pain "[e]verywhere." (Tr. 51).

England asserted that she could dress and bathe herself, did not do much cooking due to difficulty standing, and visited only the gas station. (Tr. 51). She could put dishes in the dishwasher, did her own laundry, and made her own bed. (Tr. 52). She did not vacuum, but attempted to sweep sometimes. (Tr. 52). She also cleaned the kitty litter box, took out lighter garbage bags. (*Id*.). She did not perform gardening because of difficulty bending over. (*Id*.).

During an average day, England would read, make toast for breakfast, took a quick shower (for fear of having a seizure in the tub), sometimes made jewelry, and talked on

10

the phone. (Tr. 53-54). England testified that she did not go to the movies. (Tr. 54). She would sometimes go to the park with her neighbor's daughter. (*Id*.).

England asserted that she could walk one block before stopping, could stand for ten to fifteen minutes, could lift one gallon of milk for a short time, and could sit for up to an hour. (Tr. 55). She was able to climb stairs with the aid of a railing. (*Id*.). She could bend over to touch her knees and calves, but no further. (*Id*.). She experienced weakness and tingling in her hands, particularly the right hand. (Tr. 56).

England asserted that memory and concentration deficits were "one of [her] major issues," that she used to be "sharp as a tack," with "the best memory," but that due to lupus she was rendered unable to "remember what happened the day before." (Tr. 56). She watched little television, and instead read poetry. (*Id*.). England also expressed frustration with her condition, asserting that "[t]his is the last place I want to be," and that she "want[s] to work." (Tr. 56).

England last took college classes in 2013; she could not remember whether she was enrolled in more than one class at that time. (Tr. 58). She was unable to go to school because of fatigue, pain, memory and concentration difficulties, and difficulty sitting due to extreme pain. (Tr. 58-59). She would also vomit at times as the result of her lupus. (Tr. 59). England asserted that her days were spent lying down because "that's all I can do." (*Id*.). England later clarified that she spent her days either sitting or lying. (Tr. 60). She described her fatigue as being so severe that it prevented her from exiting bed. (*Id*.). Somewhat vaguely, England also testified that if she "allowed [her]self to sleep the way

11

[she] wanted to, [she] would end up killing [her]self." (Tr. 60-61). England also noted that her condition had worsened over time, and acknowledged that she would likely die younger than her peers, perhaps driving her to engage in risky behavior like smoking. (Tr. 61).

###       c.       The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine England's ability to perform work. (Tr. 62). The ALJ asked the VE to assume a hypothetical individual with England's age, education, and work experience, and who had no exertional limitations, but who

> would be limited to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements involving only simple, work-related decisions with few, if any, work place changes. In addition, this individual, due to anxiety, would be limited to occasional contacts with coworkers, supervisors and the general public . . . . In addition, this individual would be off task eight percent total during the work day. This person would be off task on average of like five minutes an hour. This does not include breaks and a period for meals.

(Tr. 64). The VE found that such a worker could perform work available in the national economy, including laundry worker, a position requiring medium exertion (97,000 jobs nationally); inspector/sorter, a light position (250,000 jobs); and packager, a sedentary position (100,000 jobs).

In a second hypothetical, the ALJ asked whether a worker limited as follows would be able to perform work: light work, and to no more than occasional use of ramps and stairs; no use of ladders, ropes, or scaffolds; occasional balancing, stooping,

12

kneeling, crouching, and crawling; no exposure to dangerous hazards, including machinery and heights; no concentrated exposure to temperature extremes, humidity, dampness, cold, or heat; no concentrated exposure to fumes like dust, odors, gases, fumes, or poorly ventilated areas; no overhead reaching with the right upper extremity; no more than frequent use of the hands for grasping and fingering; no more than frequent pushing and pulling with the right dominant hand; and no more than frequent reaching in all directions with the right upper extremity. (Tr. 66). The VE found that such a worker could still perform work as an inspector, and could also perform work as a packager (250,000 jobs) or assembler (200,000 jobs). (Tr. 66-67).

In a third hypothetical the ALJ asked whether work would be available for a person further limited to lifting ten pounds occasionally and lesser weight frequently; who could stand or walk for two hours daily, and sit for six hours; who could sit for up to twenty minutes at a time; and stand for five to ten minutes at a time, changing position twice hourly. (Tr. 67). The VE found that sedentary work would still be available in the form of simple sorting (100,000 jobs); assembly (75,000 jobs); and packager (100,000 jobs). (*Id*.).

In his fourth hypothetical, the ALJ asked whether work would remain for an individual who would miss three days of work monthly. (Tr. 68). The VE found that this limitation would preclude all competitive work. (*Id*.).

In a fifth and final hypothetical, the ALJ asked whether being off task twenty percent of the workday would preclude all work; the VE found that it would. (Tr. 68).

13

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and

the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. §

404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir.

2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating
> source's medical opinion, supported by the evidence in the case
> record, and must be sufficiently specific to make clear to any
> subsequent reviewers the weight the adjudicator gave to the treating
> source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For

example, an ALJ may properly reject a treating source opinion if it lacks supporting

objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41

(E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995)

(unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's

statements about pain or other symptoms with the rest of the relevant evidence in the

record and factors outlined in Social Security Ruling 96-7p. Credibility determinations

regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of

Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's

credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r

of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith

v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d

387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating

subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL

16

374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

17

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G. Analysis

England argues that the ALJ erred in the following ways: 1) Giving insufficient weight to the opinions of treating physician Dr. Vallance, 2) Improperly concluding that England's fibromyalgia and lupus were not disabling, 3) Failing to properly account for England's moderate limitations to concentration, persistence, or pace ("CPP"), 4) Insufficiently accounting for England's concentration limitations. (Doc. 17 at 14-24). These arguments will be addressed in turn.

18

### 1.   *The ALJ Properly Evaluated Dr. Vallance's Opinion*

England first argues that the ALJ erred by giving in sufficient weight to the opinion of Dr. David Vallance. (Doc. 17 at 14-18). England treated with Dr. Vallance numerous times between July 2010 and October 2013. (Tr. 424, 673). Dr. Vallance first concluded that England was disabled in November 2010, writing only that she "suffers from systemic lupus erythematosus and fibromyalgia. I first evaluated her on July 28, 2010, and affirm that she has been and continues to be medically disabled from that date." (Tr. 240, 560). Dr. Vallance re-issued that disability certificate in November 2011. (Tr. 567). Dr. Vallance also issued a medical examination report in February 2012, but that report does not include a finding of disability, nor any particular functional limitations, but rather merely lists diagnosed conditions and the factors used to diagnose those conditions, without any discussion of the limitations resulting from those conditions. (Tr. 262-63). The ALJ gave no weight to these findings, and little weight to Dr. Vallance's other clinical notes. (Tr. 28).

At the outset, the Court notes that opinions on the issue of disability are reserved to the Commissioner, thus a physician's finding of disability is due no weight. *See Engebrecht v. Comm'r of Soc. Sec.*, 572 F. App'x 392, 399 (6th Cir. 2014) (concluding that a physician's opinion on the issue of disability "is not a medical opinion at all, but a legal conclusion," and is thus due no deference). The ALJ thus properly assessed no weight to Dr. Vallance's November 2010 and 2011 findings of disability, because those records contain no detail beyond an assertion that England was disabled. As established

19

by 20 C.F.R. § 404.1527(a)(2), medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Dr. Vallance's February 2012 statement of England's diagnosed impairments (Tr. 641) was likewise not a medical opinion at all, because it contained no statement about her symptoms, diagnosis, prognosis, restrictions, or ability to perform work. *See Bruce v. Comm'r of Soc. Sec.*, No. 10-10426, 2011 WL 833792, at *3 (E.D. Mich. Mar. 4, 2011) ("A mere diagnosis does not establish a severe impairment or the existence of a functional limitation.").

England argues in her reply brief that the definition of medical opinions should be construed broadly to include all "examination findings, including symptoms, diagnoses, and prognoses," thus "*all* of Dr. Vallance's findings" are medical opinions, "not just his conclusions as to disability." (Doc. 21 at 3). Putting aside whether this argument was timely raised, England has misconstrued the definition of "medical opinion." As noted above, the statute defining medical opinions provides that they are "judgments about the nature and severity of your impairment(s)," which can include judgments regarding "your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Thus,   in   order   to constitute a "medical opinion," a doctor must render a judgment about both the nature *and* severity of the claimant's impairment, and this conclusion may include information

20

about the symptoms, diagnosis, prognosis, or residual capacity, insofar as those criteria might assist the ALJ in determining the nature and severity of the underlying condition. "[T]he mere diagnosis of a condition or impairment sheds no light on the extent to which such limits the individual in question," thus a physician who merely diagnoses a disorder has not issued a medical opinion at all. *Lopez v. Comm'r of Soc. Sec.*, No. 1:13-CV-540, 2014 WL 2571247, at *8 (W.D. Mich. June 9, 2014); *see also Davis v. Comm'r of Soc. Sec.*, No. 11-CV-14094, 2012 WL 4378428, at *12 (E.D. Mich. June 15, 2012) ("[A] mere diagnosis does not appear to be a 'medical opinion' as that term is used within the applicable regulations."), report and recommendation adopted, No. 11-14094, 2012 WL 4426202 (E.D. Mich. Sept. 25, 2012).

England is thus incorrect in her assertion that all of Dr. Vallance's notes are medical opinions merely because they contain diagnoses and lists of symptoms. Instead, Dr. Vallance's findings are medical opinions only insofar as they reflect statements about the nature *and* severity of her impairments, as supported by reference to things like her symptoms, diagnoses, prognoses, and limitations. This distinction is a crucial one, because the ALJ must provide "good reasons" for failing to defer to medical opinions, but does not owe any particular deference to a physician's findings and opinions which are not "medical opinions." *See Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492-93 (6th Cir. 2010) ("[A] treating physician's opinion is only entitled to . . . special attention and deference when it is a *medical opinion*.") (emphasis original).

21

This is not to say that the ALJ was free to simply disregard the remainder of Dr. Vallance's findings. Instead, the ALJ's decision "need only 'explain the consideration given to the treating source's [non-medical] opinion.'" *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 493 (6th Cir. 2010) (quoting SSR 96–5p, 61 Fed. Reg. at 34474). The ALJ noted that Dr. Vallance described England's lupus as "mild," and that Dr. Vallance's "low level of treatment" with "multiple unremarkable examinations" suggested "overall a stable condition." (Tr. 26). The ALJ supported this conclusion by noting that England did not seek "emergency or hospital care for [her] allegedly disabling conditions." (*Id.*). A review of Dr. Vallance's treatment notes demonstrates that this characterization is a fair one.

Dr. Vallance's treatment notes frequently repeat the same information in a manner which obscures his actual conclusions. For instance, in August 2012 Dr. Vallance wrote in the "history of present illness" section that England was "now starting her third month of Plaquenil with subjective improvement." (Tr. 460). He repeated this same language in August 2011, June 2012, and October of 2013. (Tr. 472, 488, 673). Dr. Vallance's "history of present illness" notes thus appear to provide only an unreliable, rarely updated picture of England's health. Likewise, Dr. Vallance's findings are consistently repeated in a section labeled "diagnosis," wherein it is noted that England suffered from fibromyalgia and lupus, amongst other conditions, all of which were "uncontrolled." (*See, e.g.*, Tr. 655). This "uncontrolled" notation persists even where Dr. Vallance's other findings suggest that England "continue[d] to do well with her mild lupus syndrome,"

22

and that her pain was "manageable" despite being "off of all scheduled opioids and benzodiazepines." (Tr. 653). While the ALJ did not specifically call out these inconsistencies, his reference to Dr. Vallance's finding of "mild" lupus syndrome, "unremarkable examinations," England's "stable condition," and inconsistency between Dr. Vallance's findings is sufficient to encompass this reasoning. Having identified this inconsistency, the ALJ was well within his rights to give lesser weight to Dr. Vallance's findings. *See Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 442 (6th Cir. 2010) ( "[I]nternal inconsistencies, conflicts with other record evidence, and lack of objective medical data provide substantial evidentiary support for the ALJ's decision not to accord [a treating physician's opinion] controlling weight.").

The ALJ also concluded that England's subjectively reported fatigue, pain, and memory loss were not reflected in Dr. Vallance's treatment notes, which recorded that her subjectively reported symptoms were improved and mild. (Tr. 26). Review of the medical records generally supports this analysis. In July 2010 England complained of memory loss, a finding which persists in Dr. Vallance's records throughout England's treatment with him. (Tr. 581). In August 2010 Dr. Vallance noted rash, swelling, joint pain, headaches, sensitivity, depression, and tenderness. (Tr. 248-49). In September 2010 England had a persistently positive antinuclear antibody results, suggestive of lupus, but was found to be doing better overall. (Tr. 433-35). Later that month he found that England had uncontrolled depression, fibromyalgia, lupus, and bursitis. (Tr. 438). In November 2010 Dr. Vallance noted "severe" symptoms, but recorded that England's pain

23

was aching and intermittent; she noted "the benefit of the Cymbalta," which is used to treat fibromyalgia, depression, and pain. (Tr. 440). In December 2010 he noted that England had stiffness and aching pain intermittently, had only one lupus "flare up," within three days of using prednisone to treat lupus, and recorded that England's pain was "better." (Tr. 448). Dr. Vallance also noted that England had several markers of lupus. (*Id*.). In March 2011 he noted that England "has done fairly well on the current program," but had "some panic attacks." (Tr. 460). In May 2011 he noted that England experienced a seizure. (Tr. 464). In July 2011 he wrote that England was sexually assaulted, had recent lupus flare-ups, and also noted that her lupus flares may be stress induced. (Tr. 468). Again in October 2011 he noted that her lupus flare-ups might be stress related, recorded recent fever, joint pain, and occasional seizures, and found that England's pain was "manageable" with use of the pain reliever Suboxone. (Tr. 476). Also that month, Dr. Vallance noted that England met four out of eleven criteria for lupus. (Tr. 482). In September 2012 he noted that England "continue[d] to do about the same with her mild lupus syndrome," that her hip bursitis "seems to be better now," and that her pain continued to be "manageable" with use of Suboxone. (Tr. 649). In December 2012 he noted aches and symptoms "suggesting" fibromyalgia; she continued "to do fairly well in school," and was "continu[ing] to do well with her mild lupus syndrome." (Tr. 653). In March 2013 England continued to "do fairly well at school," and continued to have "manageable" pain thanks to her use of Suboxone. (Tr. 657). In March 2013 England reported "spells" of lupus, which "clinically seem more like anxiety, but conceivably

24

could be CNS lupus." (Tr. 663). In September 2013 England had a seizure, and continued to do "fairly well at school." (Tr. 669-70). In October 2013 England reported greater pain due to cold, damp weather; her pain remained manageable with Suboxone; Dr. Vallance recorded that she experienced "[n]eurological disorder" with "seizure and/or psychosis." (Tr. 675).

The ALJ's interpretation of Dr. Vallance's records is thus largely consistent with the record. That physician indeed found that England suffered from fibromyalgia, lupus, bursitis, seizures, and other conditions. Yet he also regularly recorded that her pain was controlled through the use of medication, that her lupus was "mild," that her pain was intermittent, and that she was able to maintain her undergraduate education despite her symptoms. He had relatively little to say about her fibromyalgia, and his notes seem to suggest that England's overall pain was well treated by Suboxone or other pain medications.

Importantly, Dr. Vallance's findings do not corroborate the extreme limitations which England proposed in her function report and testimony before the ALJ. England asserted in her function report that she found it difficult to stand for more than twenty minutes, sit for thirty minutes, walk one-half mile; napped three to four times daily; and slept twelve hours nightly. (Tr. 200, 205, 207). Likewise Dr. Vallance's findings do not support England's assertions at the hearing that she could walk only one block or stand for ten to fifteen minutes. (Tr. 55). As the ALJ properly noted, these restrictions do not comport with Dr. Vallance's finding of "mild" lupus and well-treated pain. (Tr. 26).

25

Similarly, while England told Dr. Vallance at least once about difficulty concentrating (which was then repeated without alteration throughout his notes), she was also able to continue her college education without apparent mental interference. This likewise does not support her statement in the function report that she was unable to pay attention and had difficulty following instructions. (Tr. 205).

England argues in her reply brief that "manageable" symptoms are not the same as "absent" symptoms, and that "improvement" of a condition is not the same as "resolution." (Doc. 21 at 4, 7). This is true enough, but it is equally true that large numbers of jobs can be performed despite the existence of distracting or uncomfortable symptoms. What counts is whether the claimant can perform that work despite their symptoms. *See* 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations.").

Although England has, as the ALJ recognized, serious impairments, the ALJ was permitted to consider inconsistencies in the evidence, and this Court's determination is limited as to whether the ALJ's decision is supported by substantial evidence. As detailed above, the ALJ's found significant inconsistencies between Dr. Vallance's findings and England's asserted symptoms, and he was permitted to discount both Dr. Vallance's findings and England's credibility on that basis.

26

2.      ***The ALJ Properly Concluded that England Is Not Disabled by Lupus or Fibromyalgia***

The parties' discussion of whether lupus was Dr. Vallance's "primary" diagnosis, or whether that condition was England's "primary" reason for filing for disability benefits is entirely beside the point. (Doc. 17 at 15-16, Doc. 20 at 10-11). It is wholly irrelevant that England listed lupus first in her application for benefits. The ALJ was obligated to consider all of England's impairments, severe and non-severe, in combination to determine whether she was disabled under the Act, thus whether he considered lupus to be her "primary" source of debility is irrelevant. *See Douglas v. Comm'r of Soc. Sec.*, 832 F. Supp. 2d 813, 826 (S.D. Ohio 2011) ("The Social Security Act requires the ALJ to consider the combined effects that individually may not be severe, but which, in combination, may constitute a medically severe impairment or otherwise evince a claimant's disability."). England does not argue that the ALJ failed to consider the totality of her impairments in combination, and review of the ALJ's decision reveals at least some discussion of all of her alleged impairments, including lupus, fibromyalgia, bursitis, and depression. The ALJ's offhanded remark that lupus was the "primary basis" for England's disability claim is legally irrelevant and presents no cause for remand.

England also argues that the ALJ improperly concluded that her lupus and fibromyalgia were not severe because of a "lack of emergency or hospital care for allegedly disabling conditions." (Doc. 17 at 16, Tr. 26). England notes that fibromyalgia is a chronic, painful disorder presenting few specific diagnostic criteria, thus the lack of

27

emergency care is not inconsistent with her claim of disabling pain. (Doc. 17 at 16). The Sixth Circuit has noted that fibromyalgia produces "'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.3 (6th Cir. 2007) (quoting Stedman's Med. Dictionary for the Health Professions and Nursing at 541 (5th ed. 2005)). The ALJ provides no reason to believe that even severe, disabling fibromyalgia would result in emergency or hospital care, and this assertion is particularly puzzling given that "the absence of objective medical evidence to substantiate the diagnosis of fibromyalgia or its severity is basically irrelevant, and more 'aggressive' treatment is not recommended for fibromyalgia patients." *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011). This portion of the ALJ's reasoning thus provides no support for his conclusion that England's fibromyalgia was not disabling. There is similarly no reason to believe that England's bursitis and lupus would require hospital care if they were disabling.

Yet diagnosis of fibromyalgia does not itself entitle a claimant to benefits, and the ALJ in this case did not base his finding solely on England's lack of hospital care. Rather, the ALJ also based his decision on a comparison of Dr. Vallance's findings and England's self-professed limitations. The ALJ permissibly concluded that Dr. Vallance's findings demonstrated largely mild symptoms with little or no limitation to England's ability to perform activities like attending school, and that England's alleged limitations did not comport with these mild findings. (Tr. 26-28). This reasoning provides sufficient

28

justification for the ALJ's decision to grant little weight to Dr. Vallance's findings, and to discount some of England's alleged limitations.

England argues in her reply brief that Dr. Vallance's finding on December 12, 2012 that she "continues to have achiness and symptoms suggesting that FMS remains an important component" (Tr. 653), suggesting that her "symptoms were not manageable by medication." (Doc. 21 at 5). Yet achiness is not by itself disabling, but only rises to that level if it precludes the performance of functions necessary to competitive work. As discussed above, the record does not support the conclusion that England's lupus, fibromyalgia, and other conditions produce such disabling symptoms.

### 3. *The ALJ Properly Accounted for England's Moderate CPP Limitations*

England next notes that the ALJ, having found that she suffered from moderate limitations to CPP, was obligated to account for those limitations in his RFC finding. (Doc. 17 at 19). While the ALJ included a limitation to "[s]imple, routine, repetitive tasks in a work environment free of fast paced production requirements involving only simple work related decisions with few, if any, work place changes; occasional contact with coworkers, supervisors, and the general public; off task 8% total during the workday for a total of 5 minutes per hour exclusive of break and meal period," England asserts that these limitations do not adequately account for her limitations to concentration, or her ability to stay on task. (*Id*. at 19-20, Tr. 25). England cites *Brown v. Comm'r of Soc. Sec.*, 672 F. Supp. 2d 794, 797 (E.D. Mich. 2009), wherein it was found that limitation to "simple, routine, repetitive, one or two step tasks" or "unskilled, routine" work would be

29

insufficient to account for moderate CPP limitations because those limitations "do[] not address the frequency of how often the person can concentrate." England thus concludes that the ALJ's "mere limitation to simple work" did not account for her moderate limitations. (Doc. 17 at 20).

Yet the ALJ did not just limit England to "simple" work here, nor to "unskilled routine work," nor merely to "simple, routine, repetitive work." Instead, he included in his RFC finding limitations to mental functioning encompassing the complexity of the work, the speed at which the work can be performed, the degree of contact with others, and to concentration, as reproduced in the paragraph above. (Tr. 25). These restrictions address every element of England's CPP limitations. Courts within this circuit have found that similar limitations adequately accounted for moderate deficits to CPP. *See Copper v. Comm'r of Soc. Sec. Admin.*, No. 1:13CV2279, 2014 WL 6879536, at *20 (N.D. Ohio Dec. 5, 2014) ("Copfer contends that the ALJ's RFC assessment limiting him to simple, routine tasks does not adequately account for his moderate limitations in maintaining concentration, persistence or pace . . . . Copfer ignores the fact that the ALJ also limited him to a work setting without frequent changes or fast pace requirements and only superficial social interactions . . . . Copfer does not explain how these additional restrictions do not adequately account for his moderate limitations in maintaining concentration, persistence or pace."); *Black v. Comm'r of Soc. Sec. Admin.*, No. 5:11CV2770, 2012 WL 4506018, at *14 (N.D. Ohio Sept. 28, 2012) (finding that a hypothetical which included limitations to simple, routine repetitive tasks performed in a

30

work environment free of fast paced production requirements, involving only simple, work related decisions, and routine work place changes, along with superficial and indirect interaction with the public, and only occasional interaction with coworkers adequately accounted for moderate deficits to CPP). The ALJ was required to account for England's credible limitations to concentration, persistence, or pace in his RFC finding, and the limitations he provided adequately compensated for those limitations.

### 4.    *The ALJ's Choice of Eight Percent Off-Task-Time Was Adequately Supported*

England also argues that the ALJ's conclusion that she would be off task approximately eight percent of the workday was improper. (Doc.17 at 21). England cites *Green v. Comm'r of Soc. Sec.*, No. CIV. 08-CV-11398-DT, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009) (report and recommendation adopted) for the proposition that a "moderate" limitation to CPP means that the worker will be off task at least "20%–30% of the time at work." The VE testified in this case that a worker who is off task for twenty percent of the day would be precluded from performance of competitive work. (Tr. 68). VEs in other benefits cases frequently testify that a worker who is off task for more than ten percent of the workday is precluded from competitive work. *See, e.g.*, *Webb v. Comm'r of Soc. Sec.*, No. 14-12097, 2015 WL 3742650, at *3 (E.D. Mich. June 15, 2015). Taking these principles together, *Green* seems to suggest that a "moderate" CPP limitation renders a claimant *per se* disabled. Yet the Court in *Green* did not reach that conclusion, but instead found only that the ALJ's limitation to "unskilled, light jobs" did

31

not satisfactorily compensate for moderate CPP limitations because it did not account for the claimant's ability to "meet quotas, stay alert, or work at a consistent pace, even at an unskilled job." *Green*, No. CIV. 08-CV-11398-DT, 2009 WL 2365557, at \*10.

Several courts have concluded that *Green* does not stand for the proposition that a moderate CPP limitation renders a claimant *per se* disabled, but rather simply that a moderate CPP limitation mandates a commensurate limitation to the claimant's RFC. *See Robinson v. Comm'r of Soc. Sec. Admin.*, No. 5:14-CV-291, 2015 WL 1119751, at \*17 (N.D. Ohio Mar. 11, 2015) ("[T]he [*Green*] court explained that an ALJ can accommodate for such a deficit and may do so by eliminating quotas"); *Coney v. Comm'r of Soc. Sec.*, No. 1:12-CV-800, 2014 WL 642225, at \*13 (W.D. Mich. Feb. 19, 2014) ("[T]he Green court simply reiterated the uncontroversial notion that if an ALJ is going to rely on the response to a hypothetical question posed to a vocational expert, the hypothetical question must accurately identify the claimant's limitations.").

Other courts have cited the twenty to thirty percent off-task-time figure suggested in *Green* without further analysis. *See Pritt v. Colvin*, No. 5:13-CV-10036, 2014 WL 2818680, at \*15 (S.D. W. Va. June 3, 2014), report and recommendation adopted, No. 5:13-CV-10036, 2014 WL 2818688 (S.D. W. Va. June 23, 2014); *Borgman v. Comm'r of Soc. Sec.*, No. CIV.A. 11-12938, 2012 WL 3542501, at \*12 (E.D. Mich. July 9, 2012), report and recommendation adopted, No. CIV.A. 11-12938, 2012 WL 3537004 (E.D. Mich. Aug. 16, 2012); *Hicks v. Comm'r of Soc. Sec.*, No. 10-CV-13643, 2011 WL

6000714, at *7 (E.D. Mich. Aug. 30, 2011), report and recommendation adopted, No. 10-13643, 2011 WL 6000701 (E.D. Mich. Nov. 28, 2011).

Yet other courts have simply rejected *Green. See Szapowal v. Comm'r of Soc. Sec. Admin.*, No. 1:13-CV-02078, 2015 WL 770327, at *3 (N.D. Ohio Feb. 23, 2015) ("Further, this Court and others in the Sixth Circuit have declined to follow *Bankston* and *Green* or distinguished them."); *Eason v. Colvin*, No. 1:13-CV-01531, 2014 WL 2114710, at *5 (N.D. Ohio May 20, 2014) ("The *Green* decision, however, is not binding on this Court and, as it fails to cite any authority for this proposition, is unpersuasive."). One court has also found that "[*i*]*f* it is possible to match terms like "mild," "moderate," and "marked" with discrete percentages of time that individuals likely cannot meet mental demands of work, that prerogative lies exclusively with the Commissioner or a qualified expert witness, not a reviewing court." *Reynolds v. Colvin*, No. 3:13-CV-396 GLS/ESH, 2014 WL 4184729, at *5 (N.D.N.Y. Aug. 21, 2014).

Review of the above cited cases demonstrates that *Green* did not establish a *per se* rule that moderate CPP limitations render a claimant *per se* disabled, but rather that it requires the ALJ to account for those limitations in his or her RFC finding and related hypothetical. Insofar as *Green* might be interpreted to establish a *per se* rule that moderate CPP limitations are disabling, the case is not binding precedent. In this case, the ALJ included numerous, highly restrictive limitations in his RFC finding, and England has wholly failed to demonstrate why these restrictions are insufficient to account for her limitations. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 498 (6th Cir. 2006)

33

("The claimant bears the burden of proof in the first four steps; if she does so, the Commissioner bears the burden in the fifth.").

Notably, England does not argue that the ALJ's finding of moderate CPP limitations insufficiently accounts for her actual limitations based on the medical record. Instead, she argues only that moderate CPP limitations render her *per se* disabled. That argument has been addressed above. The ALJ found that England's medical record revealed "no consistent mental health treatment." (Tr. 27). England disputes this characterization, noting that she was being treated with Zoloft and Cymbalta, treated at least twice with Dr. Lewis Okun to address her post-traumatic stress disorder ("PTSD") symptoms, and was found to suffer from PTSD by Dr. Bishop. (Doc. 17 at 22-23). Yet England did not regularly treat with a counselor, therapist, psychotherapist, psychologist, or psychiatrist at any point in the medical record. The ALJ's characterization of England's treatment as "inconsistent" is entirely accurate.

Depression was noted on at least thirteen occasions by England's treating physicians between 2009 and 2011, with most mentions of that ailment occurring between January 2009 and July 2010. (Tr. 317, 345-47, 361, 377, 382-84). Several treating professionals also noted anxiety between January 2009 and March 2010, with an additional mention in August 2011. (Tr. 317, 361, 366, 367, 377, 382). She was also noted to be addicted to painkillers, most notably by Dr. Berland who forbade her from taking benzodiazepine, and who noted active psychiatric disease in the form of opioid addiction. (Tr. 313). England suffered several seizures in 2010, along with one in 2011.

34

(Tr. 322-27, 345-48, 351-56). England was sexually assaulted in June 2011 (Tr. 318-19); Dr. Berland recommended PTSD therapy in August 2011 (Tr. 313), and PTSD was diagnosed in October 2012 (Tr. 575-78). In February 2012 she was noted to be taking attention deficit disorder medication (Tr. 291-92), but in April 2012 it was noted that she experienced no attention deficit symptoms (Tr. 575-78). In October 2012 psychologist Elizabeth Bishop diagnosed a Global Assessment Function ("GAF") score of 55.[2] Dr. Bishop concluded that "[g]iven her PTSD and multiple medical issues, it is unlikely that [England] can maintain consistent employment at present." (Tr. 577). The ALJ reasonably found this opinion inconsistent with the GAF score of 55, and with England's subsequent school and work activities, and thus gave little weight to Dr. Bishop's findings. (Tr. 27).

While the medical record certainly shows that England suffered from anxiety, depression, substance abuse, seizures, and PTSD, all of which are serious conditions, there is little evidence that these conditions resulted in functional limitations for which the ALJ should have accounted. England has failed to explain how the ALJ's restrictions to simple, routine, repetitive tasks in a work environment free of fast paced production requirements, with only simple workplace decisions, few if any workplace changes, limited contact with others, and being off task for eight percent of the day do not

---

[2] A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994).

adequately compensate for her mental limitations. Having failed to carry her burden, England has not presented an adequate ground for remand on this issue.

England next argues that the ALJ's finding that she could be off task for up to eight percent of the workday is an arbitrary figure, not supported by any evidence in the medical record. (Doc. 17 at 21). England muses as to why that figure should not be "10% or even 100%." (*Id*.). Courts in this circuit have little addressed this question, but England's argument has found some success in a sister district to the west. In *Beyer v. Colvin*, No. 14-CV-673-JDP, 2015 WL 5076972, at *2 (W.D. Wis. Aug. 26, 2015) the court concluded that an ALJ's failure to "explain how she determined the quantity of time that [the claimant] would be off task" required remand, because the ALJ's unexplained finding that the claimant would be off task for ten percent of the work day was not supported by references to the record. Likewise, the court in *Olivarez v. Colvin*, No. 12-CV-884-WMC, 2015 WL 1506084, at *5 (W.D. Wis. Apr. 1, 2015) found that there was some "question as to how the ALJ arrived at the figure of 5% off-task reduction." Finding "nothing in the evidence to support this quantitative conclusion," including no "attempt to explain how the doctors' qualitative limitations lead to a seemingly arbitrary percentage," the court found that remand was appropriate. *Id*.; *see also Oravec v. Colvin*, No. 13-CV-41-WMC, 2015 WL 1486380, at *6 (W.D. Wis. Mar. 31, 2015) (reaching the same conclusion using nearly identical phrasing). Likewise, in *Harlston v. Colvin*, No. 14-CV-1606, 2016 WL 772790, at *10 (N.D. Ill. Feb. 29, 2016) the court found that an ALJ's use of five percent off-task-time was arbitrary, having not been "discussed by any

36

of claimant's treating physicians or state consultants," and concluding that "the accommodation appears to be an arbitrary figure provided by the ALJ as a means of avoiding factoring in certain restrictions, including mental limitations," thus meriting remand.

On the other hand, in *Reed v. Astrue*, No. 10 C 0001, 2011 WL 3895302, at *13 (N.D. Ill. Aug. 31, 2011) the court concluded that while "the specific percentage of the deficit was somewhat arbitrary—there is no specific formula for translating the record evidence into a particular percentage deficit . . . .  But the 10% deficit is no more arbitrary than the 25% deficit. More importantly, it is supported in the record and explained in the ALJ's decision." The court in *Cain-Wesa v. Astrue*, No. 11-C-1063, 2012 WL 2160443, at *19 (E.D. Wis. June 13, 2012) similarly found that nothing precluded an ALJ from converting moderate CPP limitations into a numerical restriction when rendering his or her RFC finding because "the Seventh Circuit has never insisted on a per se requirement that specific terminology be used in the hypothetical in all cases, and because "the ALJ included other specific limitations in the hypothetical and the RFC that addressed plaintiff's problems with concentration, persistence, and pace." Finally, in *Wennersten v. Colvin*, No. 12-CV-783-BBC, 2013 WL 4821474, at *3 (W.D. Wis. Sept. 10, 2013) the court affirmed the ALJ's use of five percent off-task-time to represent moderate CPP limitations because the claimant "cite[d] no evidence to support a conclusion that any of his impairments would cause him to be off task more than five percent of the time. That failure alone is a sufficient ground to affirm the decision."

Reviewing these decisions, some courts reject the use of percentages to describe CPP deficiencies wholesale, other courts look to whether the ALJ presented sufficient justification for the percentage chosen, and yet others reject challenges to the chosen percentage unless the claimant can show that the ALJ's favored percentage is inaccurate. There is no precedent in this circuit precluding the use of a numerical off-task-time figure to represent qualitative deficits in CPP; rejecting the ALJ's use of the eight percent figure out of hand would be inappropriate. As to the justification for choosing eight percent off-task-time, the ALJ notes that England complained of memory and concentration difficulties, but was able to attend school and demonstrated normal memory, attention, and reasoning in a mental health examination. (Tr. 24, 27). Dr. Bishop's review of England's medical health revealed no obvious deficits in terms of memory, concentration, abstract thinking, or judgment. (Tr. 577). Simply stated, there is very little support in the medical record for England's alleged memory and concentration difficulties, what little support there is comes in the form of recording of subjective complaints, and is unaccompanied by any evidence of functional limitations resulting from those difficulties. While the ALJ likely could have entirely rejected England's alleged memory and concentration limitations due to this dearth of support, he gave additional deference to her claim, and included a numerical restriction to her ability to concentrate. I therefore suggest that the ALJ's choice of eight percent to represent the amount of time Plaintiff may be off-task does not undermine the substantial evidence of record which supports his decision.

38

In sum, while England undoubtedly suffers from several severe conditions, including fibromyalgia, lupus, and PTSD, along with resulting pain and concentration issues, the medical record does not support England's allegation that these symptoms are disabling. The ALJ's characterization of the medical evidence was holistic, fair, and accurate, and England has failed to identify any justification for remand.

### H.   Conclusion

For the reasons stated above, the Court **RECOMMENDS** that England's Motion for Summary Judgment (Doc. 17) be **DENIED**, the Commissioner's Motion (Doc. 20) be **GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit*

*Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: July 11, 2016                    S/ PATRICIA T. MORRIS
                                       Patricia T. Morris
                                       United States Magistrate Judge


**CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.


Date: July 11, 2016                    By s/Kristen Krawczyk
                                       Case Manager


40